IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BARBARA DACHMAN,<br><br>**Plaintiff**,<br><br>v.<br><br>DR. FEDERICO MAESTRE-GRAU, JANE DOE, AND THE CONJUNGAL PARTNERSHIP CONSTITUTED BY THEM; SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MEDICO-HOSPITALARIA (HEREINAFTER "SIMED"); JOHN DOE, RICHARD ROE, PHILLIP POE AND KIM DOE; EYE CARE OF SAN JUAN, PSC; CORPORATIONS X, Y AND Z; INSURANCE COMPANIES "C", "D", "E", AND "F",<br><br>**Defendants.** | **CIVIL NO. 18-1421 (RAM)** |

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Plaintiff Barbara Dachman's ("Plaintiff") *Motion in Limine to Exclude Defendants' Experts and the Chronology Notes and Motion to Strike for Fraud to the Court* ("*Motion in Limine*"). (Docket No. 123). Co-defendants Dr. Federico Maestre-Grau ("Dr. Maestre-Grau") and his insurer Sindicato de Aseguradores para la Suscripción Conjunta de Seguro de Responsabilidad Profesional Médico-Hospitalaria ("SIMED") filed a *Motion Acquiescing to Plaintiff's Request for Exclusion of Dr.*

*Kenneth Kenyon and the Chronology* ("*Motion Acquiescing to Plaintiff's Request*"). (Docket No. 138). After reviewing the parties' arguments, the record and applicable law, the Court **GRANTS** in part and **DENIES** in part the *Motion in Limine* and **GRANTS** the *Motion Acquiescing to Plaintiff's Request*. Any reference to the chronology notes or Dr. Kenneth R. Kenyon's ("Dr. Kenyon") expert report are hereby **STRICKEN** from the record. For the following reasons, the *Motion in Limine's* remaining requests are **DENIED**.

## I. BACKGROUND

On June 27, 2018, Plaintiff filed a *Complaint* against Eye Care of San Juan, PSC; Dr. Maestre-Grau; and SIMED (jointly, "Defendants"), alleging negligence and medical malpractice under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-5142 (the "*Complaint*"). (Docket No. 1). Plaintiff claims that after Dr. Maestre-Grau performed cataract surgery on her right eye, she was unable to see properly out of that eye and that there were large particles floating around therein. Id. ¶ 48. Plaintiff posits she eventually "lost complete depth perception" and "could not see at all through her eye." Id. ¶ 55. Dr. Maestre-Grau went on to perform three YAG laser procedures on that eye, purportedly without Plaintiff's consent. Id. ¶¶ 43-46, 51-52, 58-62.

On June 15, 2022, Plaintiff moved to exclude the testimony of Defendants' experts Dr. Kenyon and Dr. Timothy G. Murray ("Dr.

Murray"), as well as chronology notes purportedly created for the exclusive use of these experts. (Docket No. 123). Plaintiff alleges Dr. Maestre-Grau committed fraud on the Court and spoliation of evidence by providing Plaintiff a spoliated copy of the hospital's Operative Report and withholding the chronology notes and/or failing to preserve a digital file of the same. Id. at 9-16. She also argues that Dr. Kenyon and Dr. Murray's testimonies should be excluded because they: (1) are unreliable and biased; (2) lack any reference to the national standard of care or methodology; and (3) include improper legal conclusions. Id. at 16-21. Lastly, Plaintiff claims Dr. Murray's testimony is cumulative. Id. at 21-22.

On July 29, 2022, Dr. Maestre-Grau and SIMED filed a *Response in Opposition to Motion in Limine Filed at Docket Number 123* ("*Response*") asserting that Dr. Maestre-Grau has not committed fraud on the Court or proffered spoliated evidence. (Docket No. 137). They also state Dr. Murray's report is reliable and should not be excluded. Id. at 19-26. Dr. Maestre-Grau and SIMED subsequently filed a motion agreeing to the exclusion of the chronology notes and Dr. Kenyon's expert report given that the latter had access to the notes when rendering his report. (Docket No. 138). Plaintiff filed a reply on September 29, 2022 (Docket No. 183) and Defendants filed a surreply on October 18, 2022 (Docket No. 197).

## II. LEGAL STANDARD

**A. The admissibility of expert witness testimony**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. *See* Fed. R. Evid. 702. Specifically, the rule establishes that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Pursuant to Rule 702, judges must ensure an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *See* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Judges assume the "role of gatekeepers to screen expert testimony that although relevant, was based on unreliable scientific methodologies." González-Pérez v. Gómez-Águila, 296 F. Supp. 2d 110, 113 (D.P.R. 2003) (citing Daubert, 509 U.S. at 597). Accordingly, judges must focus "solely on principles and

methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Although conclusions and methodology are not entirely distinct, a court may conclude "there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Experts cannot merely state their qualifications, conclusions, and assurances of reliability. *See* Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995). "[I]f a witness is relying mainly on experience, he must provide more information for the Court to determine the reliability of his testimony." Santa Cruz-Bacardi v. Metro Pavia Hosp., Inc., 2019 WL 3403367, at *2 (D.P.R. 2019). Nevertheless, if "the factual underpinning of an expert's opinion is weak" it affects "the weight and credibility of the testimony -- a question to be resolved by the jury." Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022) (citations and internal quotation marks omitted).

**B. Which physicians are qualified to testify as experts**

When analyzing the admissibility of an expert witness, the court must first resolve whether they are qualified by knowledge, skill, experience, training, or education, to offer testimony. *See* Mitchell v. United States, 141 F.3d 8, 14 (1st Cir. 1998) (citation omitted). An expert physician need not be "a specialist in a particular medical discipline to render expert testimony relating to that discipline." Gaydar v. Sociedad Instituto Gineco-

Quirurgico y Planificacion, 345 F.3d 15, 24 (1st Cir. 2003) (citation omitted). While credentials such as board certification in a medical specialty are relevant when considering the weight and probative value of expert testimony, they are not necessary for its admissibility. *See* Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 114 (1st Cir. 2010).

**C. Evidence in medical malpractice cases**

In medical malpractice cases under Puerto Rico law, plaintiffs must establish: (1) the "duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances)[;]" (2) an act or omission breaching that duty; and (3) "a sufficient causal nexus between the breach and the claimed harm." Martínez, 33 F.4th at 23 (citations omitted). In these types of cases, physicians must comply with the national standard of care. *See* Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 190 (1st Cir. 1997) (citation omitted). Thus, a physician's duty is to provide patients with care "that, in the light of the modern means of communication and education, meets the requirements generally recognized by the medical profession." Ramirez-Ortiz v. Corporacion Del Centro Cardiovascular de Puerto Rico y Del Caribe, 32 F. Supp. 3d 83, 87 (D.P.R. 2014) (citations omitted). This can be achieved by referencing "a published standard, [discussion] of the described course of treatment with practitioners outside the District ... at

seminars or conventions, or through presentation of relevant data." Strickland v. Pinder, 899 A.2d 770, 773-74 (D.C. 2006) (internal citations omitted).

Moreover, health-care providers are presumed to have exercised a reasonable level of care. *See* López-Ramírez v. Toledo-González, 32 F.4th 87, 91 (1st Cir. 2022) (citation omitted). Therefore, plaintiffs bear the burden of refuting said presumption. Given that "medical knowledge and training are critical to demonstrating the parameters of a physician's duty, **the minimum standard of acceptable care [...] must ordinarily be established by expert testimony**." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993) (emphasis added) (citations omitted).

### III. ANALYSIS

**A. Dr. Murray's report is reliable and relevant**

As an initial matter, Plaintiff has not averred that Dr. Murray is unqualified to render expert testimony in the case at bar. Further, as seen below, Dr. Murray: (1) identifies the standard of care; (2) explains how Dr. Maestre-Grau did not deviate from it; and (3) supports his findings with published research. (Docket No. 123-14). Thus, his testimony complies with Fed. R. Evid. 702 and the applicable case law because it is relevant, would assist the trier of fact to understand the evidence, and has a reliable foundation. *See* Daubert, 509 U.S. at 597.

Dr. Murray's report and supplemental report begin by summarizing Plaintiff's clinical care and procedures performed on her. (Docket No. 123-14 at 1-5, 92-100). He then explains the expected clinical course, causation, and issues regarding the standard of care, and summarizes his findings. Id. at 4-5, 95-96. He concludes that:

> Surgical indication was decreased visual acuity and compromised visual function meeting standard indications for surgery. The surgical approach via phacoemulsification with intraocular lens implantation was also standard. Post-operatively residual, initially unrecognized, lens fragments were noted to impact visual function and required first, YAG laser disruption, followed, ultimately, by vitrectomy. After close follow-up over an 8-month post-operative course the surgical eye was documented to recover a VA of 20/25, normal IOP, without evidence of active inflammation, with stable IOL centration, and with minimal macular edema. In this setting, macular edema is often seen with uncomplicated anterior segment cataract surgery.
>
> In my opinion, both Drs. Maestre and Berrocal delivered outstanding coordinated clinical care for Ms. Dachman.

Id. at 5.

Dr. Murray's supplemental report includes a review of Plaintiff's experts' reports by Dr. Robert WH Mason, Dr. William "Buddy" Culbertson, and Dr. William "Bill" Smiddy. Id. at 96-100. However, Dr. Murray finds that this review does not alter his opinion "that Dr. Maestre performed focused ongoing care for Ms. Dachman for 10 years prior to her cataract surgery and followed

her exhaustively, with appropriate consultation and referral[.]" Id. at 100.[1]

    i.   Dr. Murray identifies a standard of care

Contrary to Plaintiff's contention, Dr. Murray does identify the standard of care governing retained lens fragments and the care provided by Dr. Maestre-Grau. To wit, he states in part:

> Unrecognized cortical fragments during "uncomplicated" phacoemulsification is a known event. The management of post-Phacoemulsification lens fragments has been **extensively reported** and requires evaluation of multiple factors, including patient symptoms, location of fragments, associated inflammation, IOL status, intraocular pressure, and retinal tear/detachment. In this case, conservative management was first employed (**typical first line therapy for minimal fragments**), virtual consultation with a retinal specialist (Dr. Berrocal), YAG disruption of centrally migrated fragments, and definitive vitreo-retinal surgery at 6 weeks.
>
> [. . .]
>
> Though lens remnants are **typically** recognized intraoperative or immediately post-operatively, delayed recognition can occur when the fragments remain trapped by the capsular bag or are located in the retro-iridial space. **Typically**, no management, other then topical therapy is required for these noncentral, non-visually compromising fragments. When more complex disruption occurs (in this case associated with the YAG capsulotomy), initial management is **often** observation, topical therapy and resolution. In Ms. Dachman's case, she remained

---

[1] Henceforth, when the Court references Dr. Murray's report, it is referring to his expert report and his supplemental report. (Docket No. 123-14 at 1-5, 92-100).

> symptomatic through 6 weeks with persistent lens fragments and standard vitrectomy was recommended and performed by Dr. Berrocal. The **most common** associated issues with post-vitrectomy managed retained lens fragments are Chronic Macular Edema, Secondary Glaucoma, or Retinal Detachment. Of these issues, Ms. Dachman has experienced macular edema which is manageable with targeted macular imaging and treatment.

Id. at 4 (emphasis added).

Further, when addressing standard of care issues present in this case, Dr. Murray explains that:

> The biggest issue for Dr. Maestre, in my opinion, is the adequacy of documentation throughout the clinical course. This case, in no way, violates the standard of clinical care delivered by Dr. Maestre, including the adequacy of consent, the operative documentation, and the close post-operative care. Further, Dr. Maestre consulted a vitreoretinal specialist (Dr. Maria Berrocal) early in the postoperative course and continued to keep her apprised of Ms. Dachman's status until referral became warranted. **I have published extensively within this space and Dr. Maestre provided excellent clinical care throughout Ms. Dachman's complex course.** In short, clinical care, timing, management, referral and follow-up are all well within the standard of care.

Id. at 5 (emphasis added).

Both First Circuit and District Court case law provides that an expert witness may sometimes imply a standard of care in their testimony without articulating the "magic words." See Cortes-Irizarry, 111 F.3d at 190 (holding that references to a "prevailing

medical standard" used by the "average gynecologist" was sufficient to establish a standard of care).

Here, although Dr. Murray fails to state the "magic words," his report includes a standard of care. Dr. Murray posits that in the present case, "conservative management was first employed" and is considered "*typical* first line therapy for minimal fragments." (Docket No. 124-14 at 4) (emphasis added). He also explains a "typical[]" course of action when lens fragments are identified intraoperatively or post-operatively and the courses of action "often" used when complex disruptions take place. Id. Lastly, Dr. Murray identifies the "*most common* associated issues with post-vitrectomy" including macular edema such as that suffered by Plaintiff and the course of action to address that issue. Id. (emphasis added).

His deposition also clarifies how "*typically*" patients with small fragments are managed. (Docket No. 123-15 at 91) (emphasis added). When asked whether he considered an inflammation after cataract surgery to be a complication, he replied it was a "*normal* healing response after cataract surgery with lens implantation." Id. at 61 (emphasis added). He also agreed with the proposition that "performance of YAG for posterior capsule opacification is the *most commonly* performed laser procedure after uncomplicated cataract surgery[.]" Id. at 68 (emphasis added). Lastly, he stated conservative management such as that provided by Dr. Maestre-Grau

to Plaintiff was "the correct management" and that Dr. Maestre-Grau's suggested observation and therapy with consultation with the retina specialist was "the *standard management* even at Bascom Palmer." Id. at 97 (emphasis added).

Read together, the words "normal," "common," "most common," and "typical," are understood as standards. "Normal" has been defined as "[a]ccording to a regular pattern" or "[a]ccording to an established rule or norm."[2] Whereas "common" or "most common" refers to "occurring or appearing frequently" or "widespread, general[.]"[3] Lastly, "typical" has been defined as "combining or exhibiting the essential characteristics of a group."[4] Thus, as they appear here, these terms are tied to clinical standards. In considering Dr. Murray's expert reports and deposition testimony as a whole, "it is reasonable to infer" that his opinion "reflects a standard of care, one that is followed nationally." Vargas-Alicea v. Cont'l Cas. Co., 2020 WL 3470325, at *12 (D.P.R. 2020) (citation omitted). Therefore, Dr. Murray may testify as to the standard of care and whether Dr. Maestre-Grau adhered to that standard here.

---

[2] *See* NORMAL, Black's Law Dictionary (11th Ed. 2019).

[3] *See* COMMON, Meriam Webster, https://www.merriam-webster.com/dictionary/common (last visited September 26, 2022).

[4] *See* TYPICAL, Meriam Webster, https://www.merriam-webster.com/dictionary/typical (last visited September 26, 2022).

ii. Dr. Murray's report is supported by data

Plaintiff likewise argues that Dr. Murray's report purportedly fails to reference medical literature or data to support his conclusions. (Docket No. 123 at 18-20). However, Plaintiff ignores the fact for years prior to issuing his expert report here, Dr. Murray has published on several issues encountered by Plaintiff and stated that his findings are based on his own publications. (Docket No. 123-14 at 4-5). For example, his juried or refereed articles and exhibitions include, alongside other co-authors, an article on "Retained Lens Fragments after Cataract Surgery: Outcomes of Same-Day versus Later Pars Plana Vitrectomy" and "Combined cataract surgery and vitrectomy for recurrent retinal detachment." (Docket No. 123-14 at 12 ¶ 14; 29 ¶ 194). Moreover, he has written extensively and given presentations on postoperative procedures such as those at issue here. *See* id. 13 ¶ 26; 17 ¶ 65; 21 ¶ 114; 25 ¶ 160; 27 ¶¶ 171-172; 33 ¶ 261; 34 ¶ 259; 35 ¶ 275; 47 ¶ 77; 62; 71; 79-81). Courts within the First Circuit have held that, when assessing an expert's reliability, a significant factor is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying[.]" Smith v. Gen. Elec. Co., 2004 WL 870832, at *3 (D. Mass. 2004) (quoting Daubert, 43 F.3d at 1317); *see also*, In re Neurontin

Mktg., Sales Pracs., Prod. Liab. Litig., 2011 WL 1048971, at *9 (D. Mass. 2011) (noting that the publication of an expert's "study in a peer-reviewed journal is not a silver bullet for admissibility, but it does present a significant obstacle for plaintiffs' contention that the methodology is unreliable.").

Given that Dr. Murray considered his own publications, several doctors' medical records, as well as opposing expert's reports when preparing his expert report, the Court finds that his opinions are based on sufficient data and facts. (Docket No. 123-14 at 1-5, 92-100). Considering the liberal interpretation courts have given to Rule 702, the Court will not preclude Dr. Murray's opinion testimony. *See* Martinez, 33 F.4th at 24. If Plaintiff seeks to attack the basis for that opinion, she may do so at trial. *See* id.

Finally, Plaintiff implies that Defendants violated Fed. R. Civ. P. 26(a)(2)(B)(ii) by not disclosing that Dr. Murray considered the chronology notes or some derivation thereof, since there are allegedly facts in Dr. Murray's report that are not mentioned in Plaintiff's medical record. (Docket No. 183 at 4-5). If Plaintiff wishes to challenge the "factual underpinnings" of Dr. Murray's opinions, she may do so through cross-examination, as those types of objections "often go to the weight of the proffered testimony, not its admissibility." Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007). Pursuant to Fed. R. Evid. 104(a), the Court

may also allow Plaintiff to question Dr. Murray under oath but outside the presence of the jury prior to his testifying to assess whether any of the statements in question came from undisclosed materials. If the Court finds that the report makes factual statements based on undisclosed documents in violation of Fed. R. Civ. P. 26(a)(2)(B)(ii), it may strike those statements from the expert report and bar Dr. Murray from testifying to those undisclosed facts.

### B. Plaintiff's claims of fraud on the Court have been addressed by striking Dr. Kenyon's report and the chronology notes

Plaintiff's *Motion in Limine* also avers that Dr. Maestre-Grau committed fraud on the Court and spoliation of evidence by providing her with a spoliated copy of the hospital's Operative Report and withholding chronology notes and/or failing to preserve a digital version of the same. (Docket No. 123 at 9-16). As to the Operative Report, Plaintiff has not provided sufficient evidence proving that Dr. Maestre-Grau produced a doctored version of the hospital's Operative Report. As to the chronology notes, given that the Court is granting the *Motion Acquiescing to Plaintiff's Request*, the Court need not address whether they constitute fraud on the Court and spoliation of evidence. Any prejudice to Plaintiff caused by the notes and/or Dr. Kenyon's expert report relying on the same is unavailing.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's *Motion in Limine* (Docket No. 123) is **GRANTED IN PART** and **DENIED IN PART**. Dr. Maestre-Grau and SIMED's *Motion Acquiescing to Plaintiff's Request* (Docket No. 138) is **GRANTED**. Any reference to the chronology notes or Dr. Kenneth R. Kenyon's expert report are stricken from the record.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico this 8th day of November 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge
